No. 16-16321

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CEDAR POINT NURSERY; FOWLER PACKING COMPANY, INC.,

Plaintiffs - Appellants,

v.

WILLIAM B. GOULD, IV; GENEVIEVE SHIROMA;
CATHRYN RIVERA-HERNANDEZ; J. ANTONIO BARBOSA,

Defendants - Appellees.

On Appeal from the United States District Court
for the Eastern District of California
Honorable Lawrence J. O'Neill, District Judge

**APPELLANTS' OPENING BRIEF**

HOWARD A. SAGASER
IAN B. WIELAND
  Sagaser, Watkins & Wieland, PC
  7550 North Palm Avenue, Suite 100
  Fresno, California 93711
  Telephone: (559) 421-7000
  Facsimile: (559) 473-1483
  E-mail: has@sw2law.com
  E-mail: ian@sw2law.com

DAMIEN M. SCHIFF
JOSHUA P. THOMPSON
WENCONG FA
  Pacific Legal Foundation
  930 G Street
  Sacramento, California 95814
  Telephone: (916) 419-7111
  Facsimile: (916) 419-7747
  E-mail: dms@pacificlegal.org
  E-mail: jpt@pacificlegal.org
  E-mail: wf@pacificlegal.org

Counsel for Plaintiffs - Appellants

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellants Cedar Point Nursery and Fowler Packing Company, Inc., state that they have no parent corporations and that no publicly traded corporation owns 10% of more of the stock of either of them.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PERTINENT CONSTITUTIONAL AND REGULATORY PROVISIONS . . . . . 2

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  The Access Regulation Forces Agricultural
         Employers To Allow Union Organizers Onto
         the Employers' Property for 120 Days Per Year . . . . . . . . . . . . . . . . . . 3

    B.  The Conditions That Prompted the Access
         Regulation in 1975 No Longer Exist Today . . . . . . . . . . . . . . . . . . . . . 5

    C.  Union Organizers Use the Access Regulation To
         Conduct a Disruptive Protest on Private Property . . . . . . . . . . . . . . . . 8

    D.  Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I. THE ACCESS REGULATION VIOLATES THE
   FIFTH AMENDMENT BECAUSE IT CONVEYS
   AN EASEMENT ON THE GROWERS' PROPERTY
   FOR UNION ORGANIZERS IN PERPETUITY . . . . . . . . . . . . . . . . . . . . 14

II. THE ACCESS REGULATION VIOLATES THE FOURTH
    AMENDMENT BY SUBSTANTIALLY AND UNREASONABLY
    INFRINGING THE GROWERS' RIGHT TO EXCLUDE . . . . . . . . . . . . . 22

   A. The Access Regulation Constitutes
      a Seizure of a Property Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

   B. The Access Regulation's Seizure of the
      Growers' Property Right Is Unreasonable . . . . . . . . . . . . . . . . . . . . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page**

## Cases

*Agric. Labor Relations Bd. v. Superior Court (Pandol & Sons)*,
  16 Cal. 3d 392 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Bertuccio v. Agric. Labor Relations Bd.*, 202 Cal. App. 3d 1369 (1988) . . . . . . . . 5

*Boise Cascade Corp. v. United States*, 296 F.3d 1339 (Fed. Cir. 2002) . . . . . . . . 19

*Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003) . . . . . . . . . . . . . . . . . . . . . 15

*Ellis v. City of San Diego*, 176 F.3d 1183 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . 14

*Harry Carian Sales v. Agric. Labor Relations Bd.*,
  39 Cal. 3d 209 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991) . . . . . . . . . . . . 17-19, 22

*Horne v. Dep't of Agric.*, 135 S. Ct. 2419 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) . . . . . . . . . . . . . . . . . 15-16, 24

*Lechmere, Inc. v. NLRB*, 502 U.S. 527 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14-16, 19-20, 22

*Love Terminal Partners v. United States*, 97 Fed. Cl. 355 (2011) . . . . . . . . . . . . 13

*Marrero v. City of Hialeah*, 625 F.2d 499 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . 29

*Miranda v. City of Cornelius*, 429 F.3d 858 (9th Cir. 2005) . . . . . . . . . . . . . . . . 30

*New York v. Burger*, 482 U.S. 691 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Newland v. Dalton*, 81 F.3d 904 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105 (1956) . . . . . . . . . . . . . . . . . . . . . 6

*NLRB v. Lake Superior Lumber Corp.*, 167 F.2d 147 (6th Cir. 1948) . . . . . . . . . 5

*NLRB v. S & H Grossinger's Inc.*, 372 F.2d 26 (2d Cir. 1967) . . . . . . . . . . . . . . 5

*Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987) . . . . . . . . . 15, 17, 20-21, 26

*Otay Mesa Property, L.P. v. United States*,
   670 F.3d 1358 (Fed. Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-19

*Pandol & Sons v. Agric. Labor Relations Bd.*,
   98 Cal. App. 3d 580 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978) . . . . . . . . . 12, 15

*Presley v. City of Charlottesville*, 464 F.3d 480 (4th Cir. 2006) . . . . . . . . . . 24-25

*PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980) . . . . . . . . . . . . . . . . . 21

*Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948 (9th Cir. 2008) . . . . . . . . . . 15

*Soldal v. Cook Cty.*, 506 U.S. 56 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Superior Farming Co. v. Agric. Labor Relations Bd.*,
   151 Cal. App. 3d 100 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
   535 U.S. 302 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15, 19

*Tex-Cal Land Mgmt., Inc. v. Agric. Labor Relations Bd.*,
   24 Cal. 3d 335 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. 4,432 Mastercases of Cigarettes,*
  448 F.3d 1168 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-28, 30

*United States v. Jacobsen*, 466 U.S. 109 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993) . . . . . . . . . 23

*United States v. Jones*, 132 S. Ct. 945 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Karo*, 468 U.S. 705 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

*United States v. Place*, 462 U.S. 696 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Sullivan*, 797 F.3d 623 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . 27

*Walter v. United States*, 447 U.S. 649 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Wash. Legal Found. v. Legal Found. of Wash.,*
  271 F.3d 835 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*WMX Technologies, Inc. v. Miller*, 197 F.3d 367 (9th Cir. 1999) . . . . . . . . . . . . 29

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) . . . . . . . . 14

**Statutes**

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

  § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Cal. Civ. Code § 801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Cal. Lab. Code § 1140, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## Regulations

Cal. Code Regs. tit. 8, § 20201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    § 20216 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    § 20900(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-3, 12, 17-18

    § 20900(e)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    § 20900(e)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    § 20900(e)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    § 20900(e)(4)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4

    § 20900(e)(5)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 25, 29

    §§ 20219-20220 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    §§ 20220-20278 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## Rule

Fed. R. App. P. 4(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## Miscellaneous

Rubin, Sara, *As members at Dole aim to withdraw from union,
UFW fights for relevance*, Monterey County Now, May 22, 2014,
http://www.montereycountyweekly.com/news/local_news/as-
members-at-dole-aim-to-withdraw-from-union-ufw/article_
d26ed6e4-e123-11e3-85a6-0017a43b2370.html . . . . . . . . . . . . . . . . . . . . . 9

Summerlin, Ryan, *County takes over food inspections*, Post Indep.,
July 22, 2016, http://www.postindependent.com/news/local/county-
takes-over-food-inspections/ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

United Farm Workers, http://www.ufw.org/_page.php?menu=about&inc
=about_vision.html (last visited Nov. 29, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## STATEMENT OF JURISDICTION

Appellants Cedar Point Nursery and Fowler Packing Company (collectively, the Growers) seek review of the (1) order of the United States District Court for the Eastern District of California dismissing the Growers' complaint with prejudice and (2) judgment in favor of Appellees William B. Gould IV, Genevieve Shiroma, Cathryn Rivera-Hernandez, and J. Antonio Barbosa, members of the California Agricultural Labor Relations Board. Jurisdiction was proper before the district court pursuant to 28 U.S.C. § 1331 because the claims in this case arise under the Constitution of the United States. This Court has jurisdiction under 28 U.S.C. § 1291.

The district court entered its order dismissing the Growers' complaint on June 29, 2016, and entered judgment for appellees on July 19, 2016. ER 2, 3. The Growers filed a timely Notice of Appeal on July 27, 2016. Fed. R. App. P. 4(a)(1)(A); ER 45.

## STATEMENT OF THE ISSUES

1. Whether the Board's Access Regulation, Cal. Code Regs. tit. 8, § 20900(e), as applied to the Growers, violates the Takings Clause of the Fifth Amendment, as incorporated against the states, by taking private property without providing a mechanism for obtaining compensation.

2.     Whether the Access Regulation, as applied to the Growers, violates the Fourth Amendment, as incorporated against the states, as an unreasonable seizure of a property interest.

## PERTINENT CONSTITUTIONAL
## AND REGULATORY PROVISIONS

The constitutional and regulatory provisions pertinent to this appeal are set forth in the addendum to this brief.

## INTRODUCTION

This appeal challenges a regulation issued by the California Agricultural Labor Relations Board (Access Regulation). The Access Regulation allows union organizers to access the private property of agricultural employers—without their consent—for the purpose of "soliciting support." *See* Cal. Code Regs. tit. 8, § 20900(e). The Access Regulation thereby substantially impinges upon employers' property rights, particularly the right to exclude unwanted persons from their businesses. Appellants Cedar Point Nursery and Fowler Packing Co., Inc., contend that the Access Regulation, as applied to them, is unconstitutional in two ways. By commandeering an easement on the Growers' property for the benefit of union organizers, the Access Regulation violates the Takings Clause of the Fifth Amendment.  And because this government-endorsed easement grab substantially and  unreasonably interferes with

the Growers' possessory interests, the Access Regulation also violates the Fourth Amendment's Seizure Clause.

## STATEMENT OF THE CASE

### A. The Access Regulation Forces Agricultural Employers To Allow Union Organizers Onto the Employers' Property for 120 Days Per Year

The Access Regulation allows union organizers to enter the "premises of [any] agricultural employer for the purpose of meeting and talking with employees and soliciting their support . . . ." *Id.* § 20900(e). It does not require the Union to obtain the property owner's consent before entering the property owner's property. Rather, the Union need only file a Notice of Intent to Take Access with the property owner. *Id.* § 20900(e)(1)(B).

After the Union files a notice, it may "access" private property for three hours per day, *id.* § 20900(e)(3) (an hour before work, an hour after work, and an hour during the lunch period), for up to 120 days per year, *id.* § 20900(e)(1)(A)-(B) (allowing the Union to access private property for four 30-day periods). The regulation prohibits organizers from engaging in "conduct disruptive of the employer's property or agricultural operations, including injury to crops or machinery or interference with the process of boarding buses." *Id.* § 20900(e)(4)(C). This constraint is largely illusory. As the regulation specifies, "[s]peech by itself shall not be considered disruptive conduct" and "[d]isruptive conduct by particular organizers

shall not be grounds for expelling organizers not engaged in such conduct, nor for preventing future access."[1]  *Id*. § 20900(e)(4)(C).  By contrast, the Access Regulation provides serious enforcement mechanisms to ensure property owners' compliance. For example, a property owner who interferes with a union organizer's attempt to enter the property is subject to an unfair labor practice charge under the California Labor Code.  *Id*. § 20900(e)(5)(C).  Further, Board regulations allow any person to file a charge, accompanied by a brief statement of facts, against any other person for engaging in such practices.  *Id.* § 20201.

A charge of an unfair labor practice triggers an investigation by the Board's regional director, who determines whether the property owner has, in fact, committed an unfair labor practice.  *Id*. § 20216.  If the regional director finds that there is no reasonable cause for the charge, the charging party may seek review by the Board's general counsel, who may issue a complaint on behalf of the Board.  *Id*. §§ 20219-20220.  A complaint drags the property owner into a litigation-like proceeding before an Administrative Law Judge.  *Id*. §§ 20220-20278.  If the judge finds that an unfair labor practice has been committed, the judge may compel "affirmative action by the

---

[1] As applied to the Growers, the Access Regulation has led to extremely disruptive protests.  For example, the regulation facilitated one protest during which union organizers used bullhorns in employee working areas.  *See infra* Part C.

respondent" to facilitate the policies of the Agricultural Labor Relations Act, and order other sanctions.[2]

## B. The Conditions That Prompted the Access Regulation in 1975 No Longer Exist Today

The extraordinary measures imposed by the Access Regulation were a response to a different time. In the decades before the Board promulgated the Access Regulation, workers often lived on the property of their employer with little to no access to the outside world. *See, e.g.*, *NLRB v. Lake Superior Lumber Corp.*, 167 F.2d 147, 148 (6th Cir. 1948) (employees lived in remote camps 18 miles from the nearest town); *NLRB v. S & H Grossinger's Inc.*, 372 F.2d 26, 29 (2d Cir. 1967) (employees lived on the premises and left "only rarely for brief visits to the neighboring village"). In 1975, California enacted the Agricultural Labor Relations Act, Cal. Lab. Code § 1140, *et seq.* Although the Act did not provide for union access on private property,

---

[2] The Board has leeway to craft appropriate remedies when it has found that an employer has engaged in an unfair labor practice. *See Harry Carian Sales v. Agric. Labor Relations Bd.*, 39 Cal. 3d 209, 232 (1985). These remedies may include forced bargaining orders, *id.*, back pay or wages, *Superior Farming Co. v. Agric. Labor Relations Bd.*, 151 Cal. App. 3d 100, 124 (1984), make-whole relief, *Bertuccio v. Agric. Labor Relations Bd.*, 202 Cal. App. 3d 1369, 1392 (1988), interest on make-whole relief, *id.*, requiring the employer to mail or read notices to workers, *Tex-Cal Land Mgmt., Inc. v. Agric. Labor Relations Bd.*, 24 Cal. 3d 335, 355 (1979), and requiring the employer to provide unions with the names and addresses of all employees, *Pandol & Sons v. Agric. Labor Relations Bd.*, 98 Cal. App. 3d 580, 588 (1979).

the Board promulgated an emergency access regulation, which took effect the day after the Act took effect.

The Access Regulation was constitutionally suspect from the beginning. After the regulation went into effect, agricultural businesses promptly challenged it in California state court under the Takings and Due Process Clauses. *Agric. Labor Relations Bd. v. Superior Court (Pandol & Sons)*, 16 Cal. 3d 392, 398 (1976). The state superior court ruled in the businesses' favor and temporarily enjoined the Board from enforcing the regulation. *Id.* at 401.

The California Supreme Court, however, vacated the injunction in a divided 4-3 decision. The majority believed that when "the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels, the right to exclude from property" must be "required to yield." *Id.* at 406 (quoting *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112 (1956)). The court upheld the regulation against the Takings Clause challenge because it found that there was a rational relationship between the Access Regulation and the purposes of the Agricultural Labor Relations Act. The dissent, on the other hand, viewed the regulation as "an unwarranted infringement on constitutionally protected property rights." *Id.* at 421 (Clark, J., dissenting). In an opinion that foreshadowed subsequent decisions by the United States Supreme Court, the dissent wrote that "the appropriate standard for review is one of balancing and not of rational

relationship[s]." *Id.* at 430 (Clark, J., dissenting). *Cf. Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 425 (1982) (Whether a regulation of property is a permissible exercise of the police power "is a separate question [from] whether [that] regulation so frustrates property rights that compensation must be paid.").

Forty years later, the union organizers continue to commandeer private property for union purposes. Yet many of the conditions that prompted the "emergency" Access Regulation no longer exist. As the conditions at Fowler and Cedar Point demonstrate, agricultural employees are generally no longer restricted to living on the property of their employer, can speak either English or Spanish, and have access to union advertising through smart phones, the radio, and other means. *See* ER 109, 113 (Compl. ¶¶ 37, 64). *See also* ER 60 (Rodriquez Decl. ¶ 4); ER 96 (Halpenny Decl. ¶ 4) (only one percent of the employees at Fowler and none of the employees at Cedar Point lack the ability to converse in either English or Spanish); ER 88 (Sanders Decl. ¶ 5); ER 99 (Arias Decl. ¶ 5); ER 93 (McEwen Decl. ¶ 5); ER 90 (Garcia Decl. ¶ 5) (employees at both Fowler and Cedar Point generally have cellular or smart phones); ER 67 (Desormeaux Decl. Exh. A) (The Union runs a multi-channel and multi-state radio network—Radio Campesina—which disseminates worker-related information). Despite these avenues to reach employees outside of the workplace, in 2015, union

organizers filed 62 notices of intent to speak to employees in the workplace of agricultural employers, including Fowler and Cedar Point. ER 107 (Compl. ¶ 20); ER 116-119 (Compl. Exh. A).

## C. Union Organizers Use the Access Regulation To Conduct a Disruptive Protest on Private Property

Fowler and Cedar Point are California-based growers that seek to make productive use of their land. Fowler, an agricultural employer based in Fresno, is one of the Nation's leading producers of mandarin oranges. ER 105 (Compl. ¶ 9). Fowler understands that its success stems from its employees. For that reason, Fowler houses an on-site cafeteria, which provides free meals to its 1,800 to 2,500 employees,[3] all of whom live in houses or hotels in the Fresno area. ER 109 (Compl. ¶¶ 36-37). Fowler also provides on-site medical care for its employees and their families free of charge. ER 109 (Compl. ¶ 36). Fowler places an emphasis on worker safety, and provides a "tip line," which allows workers to anonymously report any dissatisfaction with working conditions. *Id.*

Cedar Point grows strawberry plants at its nursery in Dorris, California, near the Oregon border. Cedar Point employs more than 400 seasonal workers along with around 100 year-round workers, who raise strawberry plants for producers in California and nationwide. ER 101 (Fahner Decl. ¶ 3). Cedar Point compensates its

---

[3] The number of employees varies throughout the year.

workers at or above the market, and provides them with complementary meals during the workday.  ER 108 (Compl. ¶ 28).  Cedar Point's management has never received complaints about the working conditions.  *Id.*  Cedar Point employees typically work from 6 a.m. to 3 p.m.  *Id.*  None of the employees lives on Cedar Point's property. ER 108 (Compl.  ¶ 27).  They instead live in houses or hotels in nearby Klamath Falls, Oregon, where they are accessible to union organizers.  *Id.*

The United Farm Workers is the nation's "largest farm workers union."  United Farm Workers.[4]  The Union is funded in part by union dues, which is three percent of every worker's weekly wage.  Sara Rubin, *As members at Dole aim to withdraw from union, UFW fights for relevance*, Monterey County Now, May 22, 2014.[5]  Long-time agricultural employees have recently led an effort to give workers "a chance to vote on whether they want out."  *Id.* (Jose Aguilar, a berry picker since 1999:  "I used to have faith in the UFW, now I don't have faith in the UFW.").  In 2015, the Union attempted to gain new members.  Instead of soliciting agricultural employees at public places or via phone, email, or social media, however, the Union filed 62 notices of intent to access private property.  ER 107 (Compl. ¶ 20); ER 116-119 (Compl. Exh. A).

---

[4] http://www.ufw.org/_page.php?menu=about&inc=about_vision.html (last visited Nov. 29, 2016).

[5] http://www.montereycountyweekly.com/news/local_news/as-members-at-dole-aim-to-withdraw-from-union-ufw/article_d26ed6e4-e123-11e3-85a6-0017a43b2370.html

On July 9, 2015, the Union filed its Notice of Intent to Take Access against Fowler. ER 118 (Compl. Exh. A). The Notice expressed the Union's intent to access employees who work at Fowler, in the cafeteria, shipping facilities, and other areas where they are stationed. The Union subsequently filed a labor charge with the Board, alleging that Fowler blocked union organizers from the premises. Then, on the eve of this litigation, the Union moved to withdraw the charge without explanation. ER 110 (Compl. ¶ 39).

On October 29, 2015, union protesters entered Cedar Point's property at approximately 5 a.m. ER 108 (Compl. ¶ 30). At around 6 a.m., the protesters moved to the trim sheds, where hundreds of employees were preparing Cedar Point's strawberry plants during the final stage of the six-week harvesting season. *Id.* The protesters disrupted work by moving through trim sheds with bullhorns, distracting and intimidating workers.[6] *Id.* After the Union entered Cedar Point's property, the Union informed Human Resources Director Rachel Halpenny that it had filed paperwork with the Board, and served the Notice of Intent to Take Access with Cedar Point. ER 109 (Compl. ¶ 32). Later, Cedar Point filed a charge against the Union with the Board, alleging that the Union had violated the Access Regulation by entering Cedar Point's property without providing proper notice. ER 109 (Compl.

---

[6] Most of the workers remained at their work stations during the protest, and many of the employees who had left the work site or joined the protest returned to work without much delay. ER 109 (Compl. ¶ 31).

¶ 34). There is no allegation from either party, however, that the Union protest at Cedar Point would have been any different had the Union served the notice before it took access.

## D. Procedural History

On February 10, 2016, the Growers filed this action in the United States District Court for the Eastern District of California. In the complaint, the Growers alleged that the Access Regulation, as applied to them, violates both the Takings Clause of the Fifth Amendment and the Seizure Clause of the Fourth Amendment to the United States Constitution. ER 104 (Compl. ¶ 5). The Growers sought injunctive and declaratory relief, and moved for a preliminary injunction on February 16, 2016. ER 120. On April 7, 2016, the Board moved to dismiss the case. ER 121.

On April 18, 2016, the district court denied the Growers' motion for a preliminary injunction on the Fifth Amendment claim, and requested supplemental briefing on the Fourth Amendment claim. The district court held that the Growers were not likely to prevail on their Fifth Amendment claim because they will not "be subject to a 'permanent physical occupation' in a manner that has been recognized by the Supreme Court." ER 37. After supplemental briefing, the district court denied the preliminary injunction motion on the Fourth Amendment claim, holding that it is unlikely that the Access Regulation "has caused or will cause a 'meaningful interference'" with the Growers' possessory interests. ER 19. The court also ruled

that the Access Regulation's interference with the Growers' possessory interests was reasonable. ER 25.

On June 29, 2016, the district court granted the Board's motion to dismiss. The court dismissed the physical takings claim for the reasons discussed in its April 18 decision denying, in part, the Growers' motion for a preliminary injunction. ER 8.[7] The court also dismissed the Growers' Fourth Amendment claim on grounds that the Access Regulation "would not allow organizers to disrupt an employer's use of his land in a significant manner," and therefore does not effect a seizure. ER 11. The Growers now appeal the district court's dismissal of the case.

## SUMMARY OF ARGUMENT

The Access Regulation imposes extraordinary burdens on the Growers by commandeering their land for union activities for up to three hours per day and 120 days per year. Cal. Code Regs. tit. 8, § 20900(e). As applied in this case, the regulation facilitated disruption on Cedar Point's property, including the use of bullhorns to distract and intimidate workers during the completion of a critical harvesting season. ER 108 (Compl. ¶ 30).

---

[7] The Court also conducted a regulatory takings analysis under *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978). Because the Access Regulation effects a physical taking, this Court need not apply a regulatory takings analysis here. The difference between physical and regulatory takings is discussed *infra* at Arg. I.

By appropriating an easement on the Growers' private property, and distributing it for the benefit of union organizers, the regulation violates the Fifth Amendment. Regulations that allow for permanent physical intrusions on private property effect a physical takings, thereby triggering the government's categorical obligation to provide a mechanism for compensation.[8] That obligation is not lessened simply because the commandeered easement does not allow for 24/7 public access. A physical taking, to be sure, presupposes "permanent" occupation. But "permanent" in this context means only that the regulation authorizing the easement has no end-date, not that the authorized access "is" continuous.

The Access Regulation also violates the Fourth Amendment's Seizure Clause. The regulation implicates the Seizure Clause by forcing the Growers to accept union organizers on the Growers' property— consequently terminating the Growers' right to exclude and thereby meaningfully interfering with their possessory interests. The resulting seizure is unreasonable in light of the alternative means that union organizers can use to communicate with employees outside of the Growers' private property. ER 113 (Compl. ¶ 64).

---

[8] Physical takings are a type of *per se* taking. *See generally Love Terminal Partners v. United States*, 97 Fed. Cl. 355, 373-74 (2011) (explaining the law of physical takings).

## STANDARD OF REVIEW

Orders granting motions to dismiss are subject to de novo review. *Ellis v. City of San Diego*, 176 F.3d 1183, 1188 (9th Cir. 1999). In reviewing the district court's dismissal decision under Rule 12(b)(6), this Court must accept the Growers' allegations as true, construe such allegations in the light most favorable to the Growers, and reverse "unless the . . . complaint fails to 'state a claim that is plausible on its face.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

## I

### THE ACCESS REGULATION VIOLATES THE FIFTH AMENDMENT BECAUSE IT CONVEYS AN EASEMENT ON THE GROWERS' PROPERTY FOR UNION ORGANIZERS IN PERPETUITY

Whether a regulation of property effects a taking depends in part on whether the regulation at issue causes a physical invasion or instead imposes solely a restriction on the use of property. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322-25 (2002). Regulations authorizing physical invasions are treated under the physical takings framework.[9] *See, e.g., Loretto*, 458 U.S. at 434-35.

---

[9] By contrast, the framework on regulatory takings is used when a land-use regulation impacts "property values in some tangential way . . . ." *Tahoe-Sierra*, 535 U.S. at 324. The analysis in those cases is characterized by "essentially ad hoc, factual
(continued...)

Such regulations effect a taking "without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831-32 (1987) (quoting *Loretto*, 458 U.S. at 434-35). And they are categorically unconstitutional under the Fifth Amendment, unless the government provides a mechanism for compensating the property owner.[10] *Id.* That conclusion follows regardless of whether the physical invasion is by the government or a government-authorized third party. *See, e.g.*, *Loretto*, 458 U.S. at 440. It also follows even when the property owner retains formal title. *Id.* at 419.

The specific property right targeted by the Access Regulation is the right to exclude. This right is "so universally held to be a fundamental element of the property right" that it cannot be taken without compensation. *Kaiser Aetna v. United States*,

---

[9] (...continued)
inquiries." *Penn Central*, 438 U.S. at 124.

[10] Monetary relief, the most common form of compensation, is both inappropriate and unavailable in this case. The intangible harms flowing from the Access Regulation— and the protests that it enables—make monetary damages both difficult to ascertain and sorely insufficient to remedy the Growers' injuries. *See Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 850 (9th Cir. 2001) (en banc), *aff'd on other grounds by Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003) ("[T]he district court should accept jurisdiction over takings claims for injunctive relief in the few cases where a Claims Court remedy is 'so inadequate that the plaintiff would not be justly compensated.'" (internal citations omitted)). Here, because the Access Regulation allows for regular intrusion onto the Growers' property, causing tangible (production) and intangible (goodwill) losses, monetary damages are not appropriate. Further, this Court has held that the Eleventh Amendment bars inverse condemnation actions under the facts of this case. *See Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948, 956 (9th Cir. 2008).

444 U.S. 164, 179-80 (1979) (finding a taking requiring compensation where government sought to obtain a navigational servitude over private waterway). Property owners are entitled to the expectation that "[they] will be relatively undisturbed" by unwelcome interlopers, and "suffer[] a special kind of injury when a *stranger* directly invades and occupies the owner's property." *Loretto*, 458 U.S. at 436.

The Access Regulation takes an easement on the Growers' private property for the benefit of union organizers. *Cf. Kaiser Aetna*, 444 U.S. at 180 (likening a potential government order prohibiting property owners from denying public access to their property as a "servitude" or "easement"); Cal. Civ. Code § 801 (listing the "right-of-way" as an easement). The regulation grants union organizers a right to the Growers' property for the purpose of soliciting union workers. Thus, regardless of economic impact, the Access Regulation substantially infringes upon the Growers' right to exclude—one of the "most essential sticks in [their] bundle of rights." *See Kaiser Aetna*, 444 U.S. at 176.

The Access Regulation imposes just the kind of "permanent physical invasion" that categorically triggers the government's duty to provide a mechanism for compensation. *Loretto*, 458 U.S. at 441. The concept of "permanence," as contemplated in *Loretto*, does not require that the physical invasion be continuous, but instead that it have no contemplated end-date. This principle was affirmed in *Nollan*,

where the Court noted that a permanent physical occupation involves laws that give third parties a "permanent and continuous right to pass to and fro, so that the real property may be continuously traversed, even though no particular individual is permitted to station himself permanently upon the premise." *Nollan*, 483 U.S. at 832. After all, the point of an access easement is so that members of the government, public, or, in this case, the Union, can get to some *other* place. In *Nollan*, the would-be easement led to a public beach, *id.* at 831; in this case, to the Growers' private property. ER 106 (Compl. ¶ 17) (citing Cal. Code Regs. tit. 8, § 20900(e)).

A similar conclusion was reached in *Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991). There, an EPA order granted government officials the power to access plaintiffs' property for purposes of "locating, constructing, operating, maintaining, and repairing monitor/extraction wells." *Id.* at 1369 (citation omitted). Government officials in *Hendler* did not stay on the plaintiffs' land, choosing instead to enter "from time to time" for the purpose of "installing and servicing those various wells." *Id.* at 1377. Like the union organizers here, the interlopers in *Hendler* went on plaintiffs' land only as "necessary to conduct their activities, and then left, only to return again" when desired. *Id.* The Federal Circuit construed the EPA order as taking a permanent easement, despite the intermittent nature of the intrusion. *Id.* at 1374. The court explained that "the concept of permanent physical occupation does not require that in every instance the occupation be exclusive, or continuous and

uninterrupted." *Id.* at 1377. Rather, a permanent occupation is one that contains no end-date—like a fee simple absolute—as distinct from a temporary occupation that operates like an estate for years. *Id.* at 1376.

Consistent with *Hendler* is *Otay Mesa Property, L.P. v. United States*, 670 F.3d 1358 (Fed. Cir. 2012). There, the Federal Circuit determined that the imposition of an easement to "install, maintain, and service sensors" on private property was a physical taking. *Id.* at 1365. The sensors could be "removed due to development of the property" and then "redeployed" by the government as needed. *Id.* at 1364. Nevertheless, the court concluded that the government had taken an easement, relying principally on the point that the easement was "perpetual," in that there was "no potential termination of the sensor easement on the horizon." *Id.* at 1367.

The same conclusion obtains here. The interest in property taken by the Access Regulation is in fact without duration—it is only the actual physical occupation by third-party union organizers that the Access Regulation limits. *See* Cal. Code Regs. tit. 8, § 20900(e). As the foregoing caselaw demonstrates, the use of an easement need not be constant for a compensable taking to arise. After over four decades (and counting) of the "emergency" Access Regulation and three rounds of briefing in this litigation, there is no evidence of a timetable for withdraw. Unlike a regulation that allows government officials onto private land to conduct owl surveys for only the next five months, *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1355 (Fed. Cir.

2002), or a moratorium on development that ends after 32 months, *Tahoe-Sierra Preservation Council*, 535 U.S. at 306, the Growers' only hope is for the Board to repeal the Access Regulation. Yet a mere possibility of repeal does not make an easement any less permanent. "[T]he government has been held to have permanently taken property, despite the fact that '[a]ll takings are "temporary," in the sense that the government can always change its mind at a later time.'" *Otay Mesa*, 670 F.3d at 1367 (quoting *Hendler*, 952 F.2d at 1376); *see also Loretto*, 458 U.S. at 438-39 (finding a permanent physical taking even when a landlord could avoid the occupation by ceasing to rent the building).

The government may not evade the prohibition on physical takings simply by enacting time, place, and manner restrictions, such as the ones contained in the Access Regulation. Access regulations, like that invalidated in *Nollan*, often contain time, place, and manner restrictions. Yet, as discussed above, time, place, and manner restrictions do not transform a physical taking into a mere regulation of use. If it were otherwise, nothing would preclude, for example, a NGO's unwelcome presence in homes every election season to teach residents the importance of voting. The right of a property owner to exclude a stranger "cannot be so easily manipulated." *Loretto*, 458 U.S. at 438-39 & n.17.

The Board may not recast the Access Regulation as a "regulation that merely restricts the use of property."  ER 37 (quoting *Loretto*, 458 U.S. at 441).  As the Supreme Court explained in *Loretto* and *Nollan*, the government's authority to restrict the use of property does not include an authority to compel property owners to surrender their property to a third party.

In *Loretto*, the Court rejected the argument that the installation of cables on private property was "simply a permissible regulation of the use of real property." 458 U.S. at 438-39.  Although the regulation in *Loretto* only applied to landlords, just as the regulation here only applies to agricultural property owners, the Court's admonition has the same effect.  *Id.* at 439 n.17 (rejecting the argument that requiring apartment-building owners to permit the installation of a cable box is a mere regulatory use restriction, because the argument "would allow the government to require a landlord to devote a substantial portion of his building to vending and washing machines, with all profits to be retained by the owners of these services").

*Nollan* was even more unequivocal on this point.  That case also involved a property owner's challenge to a public access easement on private land.  To say, as the government there argued, that the commandeering of an easement on private property is "a mere restriction on its use" would be, in the Court's view, "to use words in a manner that deprives them of all their ordinary meaning."  *Nollan*, 483 U.S. at 831.

Importantly, holding that the Access Regulation, as applied to the Growers, effects a physical taking would not call into question all government-authorized access regimes, as the district court thought. ER 40. Because the Access Regulation takes an easement on private land, invalidating it would have little impact on access regulations for businesses open to the public. In *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), for example, the Supreme Court held that "a law limiting a property owner's right to exclude certain speakers from an already publicly accessible shopping center did not take the owner's property." *See Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2429 (2015) (discussing *PruneYard*). That the shopping center chose to make its property open to the public made all the difference in *PruneYard*—and distinguishes the decision from this case. *See Nollan*, 483 U.S. at 832 n.1 ("The holding of [*PruneYard*] is not inconsistent with this analysis, since there the owner had already opened his property to the general public . . . .").

Additionally, a favorable decision for the Growers would not inhibit the government's ability to conduct administrative searches of restaurants, coffee shops, and the like. Most administrative searches occur infrequently,[11] and take place in areas known to be regulated. *See New York v. Burger*, 482 U.S. 691, 702-03 (1987).

---

[11] *E.g.*, Ryan Summerlin, *County takes over food inspections*, Post Indep., July 22, 2016 ("Convenience stores, hotels, coffee shops, schools and mobile units are inspected once a year."), http://www.postindependent.com/news/local/county-takes-over-food-inspections/.

There is a world of difference, however, between those regulations and the Access Regulation, which allows for third parties to enter private property—otherwise closed to the public—for 120 days every year. *See Hendler*, 952 F.2d at 1371 ("The distinction between the government vehicle parked one day on O's land while the driver eats lunch, on the one hand, and the entry on O's land by the government for the purpose of establishing a long term storage lot for vehicles and equipment, on the other, is clear enough."). Therefore, a ruling for the Growers would not invalidate every measure of access, but only those that violate the Takings Clause by commandeering permanent, public-use easements.

In sum, because the Access Regulation provides for perpetual physical invasion on the Growers' property, it must be analyzed under the physical takings test. Under that test, the regulation is categorically unconstitutional because the government has not provided a mechanism for compensation. *Cf. Loretto*, 458 U.S. at 441.

## II

### THE ACCESS REGULATION VIOLATES THE FOURTH AMENDMENT BY SUBSTANTIALLY AND UNREASONABLY INFRINGING THE GROWERS' RIGHT TO EXCLUDE

The Access Regulation so disrupts the settled property expectations of the Growers that it violates the Fourth Amendment's Seizure Clause. The regulation goes beyond a mere interference with a property right and instead effectively terminates the

Growers' right to exclude unwanted third parties from their property by unreasonably seizing an access easement over the Growers' property.

## A. The Access Regulation Constitutes a Seizure of a Property Interest

The Fourth Amendment applies in the civil context and to real property. *See, e.g.*, *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 52 (1993) (noting that seizure of real property implicates constitutional protections of both the Fourth and Fifth Amendments). The Fourth Amendment limitations on seizure protect possessory interests, and are not limited to contexts where privacy or liberty interests alone are implicated. *Soldal v. Cook Cty.*, 506 U.S. 56, 62 (1992) ("[O]ur cases unmistakably hold that the Amendment protects property as well as privacy."). Moreover, the Fourth Amendment is implicated when, as here, third parties act with the "participation or knowledge of any government official." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (quoting *Walter v. United States*, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)).

Contrary to the Board's contention below, the protections of the Seizure Clause do not depend on whether a regulation, on its face, allows for unwanted third parties to "disrupt [one's] use of his land in a significant manner." ER 11. Rather, a seizure occurs whenever there is a meaningful interference with an individual's possessory interests in property. *See Jacobsen*, 466 U.S. at 113. A "meaningful interference"

occurs when the character of the property is profoundly different with the interference than without it. *See United States v. Karo*, 468 U.S. 705, 729 (1984) (Stevens, J., concurring). By creating an access easement for union representatives, the Access Regulation effects a meaningful interference with the Growers' possessory interests.

The Access Regulation substantially reduces the Growers' right to exclude—one of the "most essential sticks" in an owner's bundle of property rights. *Kaiser Aetna*, 444 U.S. at 176. And by transforming the Growers' property from a forum for production into a proselytizing opportunity for union organizers, the regulation profoundly changes the nature of the property.[12]

The Fourth Circuit upheld a Fourth Amendment claim under similar alleged facts. In *Presley v. City of Charlottesville*, 464 F.3d 480 (4th Cir. 2006), the city had published a map showing a public access trail cutting across privately owned land along a popular river. *Id.* at 482. The city, however, had failed to correct the map, even when told of the error, and regular intrusions by members of the public ensued. *Id.* The Fourth Circuit held that the property owner validly "allege[d] an unreasonable seizure of her property." *Id.* at 483.

---

[12] As stated above in Section A of the Statement of the Case, although the regulation does not allow for disruptive conduct, this prohibition is not backed by any kind of meaningful enforcement mechanism.

The government interference with the Growers' property is even more severe. In *Presley*, the "active and knowing encouragement" of government precipitated the initial trespass, but the property owner retained the right to call law enforcement to eject trespassers. *Id.* at 482-83. Here, however, the Growers face sanctions under the Access Regulation if they prevent union organizers from entering their property. *See* Cal. Code Regs. tit. 8, § 20900(e)(5)(C). In *Presley*, the seizure was limited to a small portion of the owner's property. *Presley*, 464 F.3d at 482. Here, the Access Regulation allows substantial access to the Growers' land for up to three hours per day, 120 days per year.

Notably, the *Presley* plaintiff established only the "regular presence" of trespassers, including those who "occasionally" camped overnight. *Presley*, 464 F.3d at 487. Yet the meaningful interference in *Presley* was the publication of the map, not the presence of trespassers. It was this publication which constituted the seizure of the owner's property. Here too, the Access Regulation continues to effect the "active and knowing encouragement" of future entry by union organizers onto the Growers' property, and goes even further by removing the right to exclude. As in *Presley*, this interference is "disruptive, stressful, and invasive"—a meaningful interference with the Growers' possessory interests in their property.

The Board's arguments below notwithstanding, nothing in *Karo* is to the contrary. ER 9-10. In *Karo*, the Supreme Court found that no Fourth Amendment

interests had been violated by the "technical trespass" of installing a tracking beeper within a shipping container. *Karo*, 468 U.S. at 712. The beeper, however, had been placed *with the consent* of the original owner before possession was transferred. *Id.* at 713. Later cases have noted this critical distinction. *See, e.g.*, *United States v. Jones*, 132 S. Ct. 945, 952 (2012) ("Karo accepted the container as it came to him, beeper and all, and was therefore not entitled to object to the beeper's presence, even though it was used to monitor the container's location.").

The Growers have not—nor has anyone save the Board—consented to the entry of the union organizers onto the Growers' property. Not only does the Access Regulation authorize a "technical trespass," it profoundly alters the character of the Grower's possessory interests by substantially eliminating one of the "most essential sticks" in the Growers' bundle of property rights—namely, the right to exclude. The effect on the Growers is the creation of an easement on their property, one that allows access up to 120 days each year, for three hours each day. As noted in Section I, *supra*, if the government had simply demanded an access easement directly from the Growers, it would have triggered a Fifth Amendment requirement to compensate. *See Nollan*, 483 U.S. at 831 ("Had California simply required the [Plaintiffs] to make an easement across their beachfront available to the public . . . we have no doubt there would have been a taking."). By creating just such an easement, the Access

Regulation also creates a meaningful interference with the Growers' property and effectuates a seizure under the Fourth Amendment.

## B. The Access Regulation's Seizure of the Growers' Property Right Is Unreasonable

"The Supreme Court has adopted a balancing test to determine whether a seizure is reasonable." *United States v. Sullivan*, 797 F.3d 623, 633 (9th Cir. 2015). To make that determination, a court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).

As applied to the Growers, the Access Regulation interferes substantially with several important possessory interests, while minimally advancing governmental interests. This is especially so where, as here, the stated government interests can be easily met through alternative means that are far less invasive than a warrantless seizure of the Growers' property. To the extent that the Access Regulation does advance government interests, it unreasonably does so through a warrantless seizure of property.[13] *See United States v. 4,432 Mastercases of Cigarettes*, 448 F.3d 1168,

---

[13] The Access Regulation interferes with the Growers' property interests through threats to sanitation and safety, productivity, and goodwill and reputation. The district court did not address unreasonableness under the Fourth Amendment claim when ruling on the motion to dismiss. However, in the course of briefing the motion for preliminary injunction, the Growers provided evidence showing both the impact of the

(continued...)

1179 (9th Cir. 2006) (a warrantless inspection is unreasonable if unnecessary to further the larger regulatory scheme).

As discussed in Section II.A, *supra*, the Access Regulation interferes with the Growers' right to exclude union organizers from the Growers' property. This inability to exclude is a significant interference with the Growers' possessory interests, creating threats to sanitation and safety, productivity, and goodwill and reputation.

For example, the Union has previously staged protests at Cedar Point during the strawberry plant harvesting season. ER 108 (Compl. ¶ 29). Further, during these protests, union representatives entered the trim sheds, areas where strawberry plants are processed for shipment. ER 108 (Compl. ¶ 30). Entry into this area places both employees and the union representatives at risk of great bodily injury.[14]

---

[13] (...continued)
seizure as well as the alternative means of access that the Board and Union had available to them. Because the district court held that the Access Regulation did not constitute a meaningful interference with the Growers' property, the Growers did not seek leave to amend and allege additional facts establishing unreasonableness, because any such amendments would have been futile. *Cf. Newland v. Dalton*, 81 F.3d 904, 907 (9th Cir. 1996) ("While Fed.R.Civ.P. 15(a) encourages leave to amend, district courts need not accommodate futile amendments."). To the extent this Court believes that the complaint does not contain sufficient allegations of unreasonableness, the Growers should now have the opportunity to amend and allege additional facts, consistent with the declarations already in the record.

[14] During harvest, the trim shed has forklifts and other large machinery moving 2,500-pound bins of strawberry plants. While the employees are trained in safety protocols, the union representatives may not be. Attempting to vet or train union representatives to ensure familiarity and compliance with safety protocols could
(continued...)

The Access Regulation also impairs productivity. Union representatives with bullhorns distract and intimidate employees during protests. ER 108 (Compl. ¶ 30). Employees may choose to leave the area, whether to join the protest or simply to avoid the disruption. *See* ER 109 (Compl. ¶ 31).

The Access Regulation also hurts the Growers' goodwill and reputation. *Cf. Marrero v. City of Hialeah*, 625 F.2d 499 (5th Cir. 1980) (injury to business reputation is compensable as the result of the violation of one's Fourth Amendment rights), *rejected on other grounds by WMX Technologies, Inc. v. Miller*, 197 F.3d 367, 375-76 & n.4 (9th Cir. 1999) (en banc) (indirect impairment of business goodwill is not constitutionally actionable unless accompanied by direct governmental violation of one's constitutional rights). Intrusive protests by union representatives interfere with employee-employer relationships that the Growers have expended significant effort to cultivate. *Cf.* ER 108, 109 (Compl. ¶¶ 28, 36).

The Access Regulation is unnecessary because the stated government interests can be easily met through alternative means that are far less invasive than a warrantless seizure of the Growers' property. Below, the Board asserted that it has substantial interests in safeguarding the rights of agricultural employees to freedom

---

[14] (...continued)

potentially open Cedar Point to charges of an unfair labor practice. *See* Cal. Code Regs. tit. 8, § 20900(e)(5)(C) ("Intereference by an employer with a labor organization's right of access . . . may constitute an unfair labor practice . . . .").

of association, self-organization, and collective bargaining. Even if these interests are assumed to be significant, the existence of equally effective and less-invasive alternatives renders the Access Regulation unreasonable. *See Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005) (a warrantless seizure is presumptively unreasonable and the burden is on the government to justify it); *see also 4,432 Mastercases of Cigarettes*, 448 F.3d at 1179 (a warrantless inspection is unreasonable if unnecessary to further the larger regulatory scheme).

Ample alternative means exist for the Board and unions to access the Growers' employees. *Cf. Lechmere, Inc. v. NLRB*, 502 U.S. 527, 537 (1992) (Under federal labor law, labor interests prevail over private property rights only in "the rare case" that employees cannot be reached "through the usual channels."). As the Growers have alleged, no employees live on site. ER 108, 109 (Compl. ¶¶ 27, 37). The Board and Union have ample opportunities available to communicate with the employees without the unnecessary seizure effected by the Access Regulation. *Cf. id.* The Access Regulation is not necessary to further the regulatory scheme asserted by the Board, and is unreasonable under the Fourth Amendment.

## CONCLUSION

For the reasons stated above, the district court's dismissal of the complaint should be reversed and the case remanded to the district court for further proceedings.

DATED: December 5, 2016.

Respectfully submitted,

DAMIEN M. SCHIFF
JOSHUA P. THOMPSON
WENCONG FA
HOWARD A. SAGASER
IAN B. WIELAND


By _____s/ Wencong Fa_____
        WENCONG FA

Counsel for Plaintiffs - Appellants

## STATEMENT OF RELATED CASES

Plaintiffs - Appellants are aware of no related cases within the meaning of Circuit Rule 28-2.6.

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**
CERTIFICATE OF COMPLIANCE WITH
TYPE-VOLUME LIMITATION, TYPEFACE
REQUIREMENTS, AND TYPE STYLE REQUIREMENTS.

1.   This opening brief complies with the type-volume limitation of Fed. R. App.
     P. 32(a)(7)(B) because:

     _X_   It contains 7,162 words excluding the parts of the brief exempted by Fed.
           R. App. P. 32(a)(7)(b)(iii), or

     ___   It uses a monospaced typeface and contains _____ lines of text,
           excluding the parts of the brief exempted by Fed. R. App. P.
           32(a)(7)(B)(iii).

2.   This opening brief complies with the typeface requirements of Fed. R. App. P.
     32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

     _X_   It has been prepared in a proportionally spaced typeface using
           WordPerfect X5 in font style Times New Roman and font size 14, or

     ___   It has been prepared in a monospaced typeface using WordPerfect X5
           with ____ characters per inch and type style _____.

DATED:  December 5, 2016.


                              ___s/ Wencong Fa_____
                              Attorney for Plaintiffs - Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

    s/ Wencong Fa
    WENCONG FA

**Addendum**
**Table of Contents**

U.S. Const. amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Cal. Code Regs. tit. 8, § 20900 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**U.S. Constitution
Amendment IV**

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

**U.S. Constitution
Amendment V**

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

**CHAPTER 9. SOLICITATION BY NON-EMPLOYEE ORGANIZERS
§ 20900. Solicitation by Non-Employee Organizers**

Labor Code Section 1140.2 declares it to be the policy of the State of California to encourage and protect the right of agricultural employees to full freedom of association, self-organization, and designation of representatives of their own choosing.

(a) Agricultural employees have the right under Labor Code Section 1152 to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, as well as the right to refrain from any or all of such activities except to the extent that such right may be affected by a lawful agreement requiring membership in a labor organization as a condition of continued employment. Labor Code Section 1153(a) makes it an unfair labor practice for an agricultural employer to interfere with, restrain, or coerce agricultural employees in the exercise of these rights.

(b) The United States Supreme Court has found that organizational rights are not viable in a vacuum. Their effectiveness depends in some measure on the ability of employees to learn the advantages and disadvantages of organization from others. When alternative channels of effective communication are not available to a union, organizational rights must include a limited right to approach employees on the property of the employer. Under such circumstances, both statutory and constitutional principles require that a reasonable and just accommodation be made between the right of unions to access and the legitimate property and business interests of the employer.

(c) Generally, unions seeking to organize agricultural employees do not have available alternative channels of effective communication. Alternative channels of effective communication which have been found adequate in industrial settings do not exist or are insufficient in the context of agricultural labor.

(d) The legislatively declared purpose of bringing certainty and a sense of fair play to a presently unstable and potentially volatile condition in the agricultural fields of California can best be served by the adoption of rules on access which provide clarity and predictability to all parties. Relegation of the issues to case-by-case adjudication or the adoption of an overly general rule would cause further uncertainty and instability and create delay in the final determination of elections.

(e) Accordingly the Board will consider the rights of employees under Labor Code Section 1152 to include the right of access by union organizers to the premises of an agricultural employer for the purpose of meeting and talking with employees and soliciting their support, subject to the following regulations:

(1) When Available.

(A) Access under this section onto an agricultural employer's property shall be available to any one labor organization for no more than four (4) thirty-day periods in any calendar year.

(B) Each thirty-day period shall commence when the labor organization files in the appropriate regional office two (2) copies of a written notice of intention to take access onto the described property of an agricultural employer, together with proof of service of a copy of the written notice upon the employer in the manner set forth in Section 20300(f).

If a petition for election is filed, the right of access shall continue until after the election as provided by Section 20900(e)(1)(C). If a run-off or rerun election is directed, the right of access shall continue until after said election as provided in Section 20900(e)(1)(C).

(C) The right to take access under this section terminates as to any labor organization after the fifth day following completion of the ballot count pursuant to Section 20360(a) in an election conducted under Chapter 5 of the Act, except that where objections to the election are filed pursuant to Labor Code Section 1156.3(c), the right of access shall continue for ten days following service of and the filing of such objections. The right to take access under this Section recommences 30 days prior to the expiration of the bars to the direction of an election set forth in Labor Code Sections 1156.5 and 1156.6, and 13 months prior to the expiration of a valid collective bargaining agreement that would otherwise bar the holding of an election but for the provisions of Labor Code Section 1156.7(d). Where the right to take access is recommenced during the pendency of a valid collective-bargaining agreement pursuant to this paragraph, no more than four thirty-day periods of access shall be permitted to any one labor organization in the 13 months preceding the expiration of said collective bargaining agreement.

Nothing herein shall be interpreted or applied to restrict or diminish whatever rights of access may accrue to a labor organization certified as a bargaining representative.

(2) Voluntary Agreements on Access. This regulation establishes the terms upon which a labor organization may take access. However, it does not preclude agreements by the parties to permit access on terms other than as set forth in this part, provided that any such agreement shall permit access on equal terms to any labor organization which agrees to abide by its terms. For the purpose of facilitating voluntary resolution by the parties of problems which may arise with access, the notice of intent to take access shall specify a person or persons who may reach agreements on behalf of the union with the employer concerning access to his/her property. The parties are encouraged to reach such agreements and may request the aid of the regional director and board agents in negotiating such agreements; however, no such attempts to reach an agreement, be they among the parties themselves or with the aid of this agency, shall be deemed grounds for delay in th taking of immediate access once a labor organization has filed its notice of intent to take access.

(3) Time and Place of Access.

(A) Organizers may enter the property of an employer for a total period of one hour before the start of work and one hour after the completion of work to meet and talk with employees in areas in which employees congregate before and after working. Such areas shall include buses provided by an employer or by a labor contractor in which employees ride to and from work, while such buses are parked at sites at which employees are picked up or delivered to work. Where employees board such buses more than one hour before the start of work, organizers may have access to such buses from the time when employees begin to board until such time as the bus departs.

(B) In addition, organizers may enter the employer's property for a single period not to exceed one hour during the working day for the purpose of meeting and talking with employees during their lunch period, at such location or locations as the employees eat their lunch. If there is an established lunch break, the one-hour period shall encompass such lunch break. If there is no established lunch break, the one-hour period shall encompass the time when employees are actually taking their lunch break, whenever that occurs during the day.

(4) Numbers of Organizers; Identification; Prohibited Conduct.

(A) Access shall be limited to two organizers for each work crew on the property, provided that if there are more than 30 workers in a crew, there may be one additional organizer for every 15 additional workers.

(B) Upon request, organizers shall identify themselves by name and labor organization to the employer or his agent. Organizers shall also wear a badge which clearly states his or her name, and the name of the organization which the organizer represents.

(C) The right of access shall not include conduct disruptive of the employer's property or agricultural operations, including injury to crops or machinery or interference with the process of boarding buses. Speech by itself shall not be considered disruptive conduct. Disruptive conduct by particular organizers shall not be grounds for expelling organizers not engaged in such conduct, nor for preventing future access.

(5) Violations of Section 20900.

(A) Any organizer who violates the provisions of this part may be barred from exercising the right of access under this part in any one or more of the four geographical areas currently designated by the Board as regions, for an appropriate period of time to be determined by the Board after due notice and hearing.

Any labor organization or division thereof whose organizers repeatedly violate the provisions of this part may be barred from exercising the right of access under this part in any one or more of the four geographical areas currently designated by the Board as regions, for an appropriate period of time to be determined by the Board after due notice and hearing.

(B) Violation by a labor organizer or organization of the access regulation may constitute an unfair labor practice in violation of Labor Code Section 1154(a)(1) if it independently constitutes restraint and coercion of employees in the exercise of their rights under Labor Code Section 1152.
Violations by a labor organizer or organization of this part may constitute grounds for setting aside an election where the Board determines in objections proceedings under Section 1156.3(c) of the Act that such conduct affected the results of the election.

(C) Interference by an employer with a labor organization's right of access under this part may constitute grounds for setting aside an election where the Board determines in proceedings under Section 1156.3(c) of the Act that such conduct affected the results of the election. Furthermore, such interference may constitute an unfair labor practice in violation of Labor Code Section 1153(a) if it independently constitutes interference with, restraint, or coercion of employees in the exercise of their rights under Labor Code Section 1152.

(6) Citrus Industry.

(A) For purposes of this subsection the term "employer" refers to any "agricultural employer" involved in the growing, harvesting or packing of citrus.

(B) The service of a Notice of Intent to Take Access or Notice of Intent to Organize upon such an employer and the proper filing of such Notice upon the appropriate regional office by a labor organization shall be deemed sufficient under Section 20900(e)(1) to permit the labor organization to take access, as provided in

this section, to the employees employed at groves and orchards of citrus fruit which the employer grows, harvests or packs.

(C) Any labor organization which has duly filed a Notice of Intent to Take Access or Notice of Intent to Organize concerning the employer may request, in writing, from the regional director a copy of the following information required to be made available pursuant to Section 20915(b): the written list of the name(s) of the owner(s)/lessee(s) and the location of each citrus grove or orchard of citrus fruit which the employer grows, harvests, or packs. If, after investigation, the regional director determines that some or all of the owner(s)/lessee(s) of the citrus groves or orchards of citrus fruit which the employer grows, harvests, or packs, are part of the bargaining unit, then, pursuant to the labor organization's request, the regional director shall provide to the labor organization(s) a list containing the names of the owner(s)/lessee(s) and the location of each grove or orchard that is included within the bargaining unit. The regional director will immediately notify the owner(s)/lessee(s) of said citrus groves or orchards in writing of the fact that a Notice of Intent to Take Access or Notice of Intent to Organize has been filed and that union organizers may take access to the grove or orchard.

(D) Upon the proper filing and service of a Notice of Intent to Take Access or Notice of Intent to Organize, the employer and the union, with the assistance of the regional director, shall establish the means whereby the employer will keep the union informed of the places and times at which the employer's crews may be found during the relevant access taking or organizing period. For purposes of this provision, crews consisting of three (3) or fewer workers may be excluded, if the employer has no knowledge of the specific locations in which such crews will be working during the day. As to such crews, the employer will provide the union with as specific a description as possible of the area in which such employees will be working. Should the employer and the union fail to establish a mutually agreeable plan for providing the union with the aforesaid information, the following procedures shall be observed:

(1) The employer shall on a day-by-day basis during the access period prepare a schedule showing the place and time where each crew will be working, including the time each crew will begin work, take its lunch break, and end work each day and directions to the location(s) where each crew will be working. Said schedule shall be posted at least two hours in advance of the start of work on each day during the access period. Posting shall occur at the location from which the employer dispatches its crews, and the employer will advise the union of that

location. The union's representatives shall be afforded reasonable access to the place where the employer posts the schedules.

(2) Should the union desire to take access on any given day during the access period, it shall so notify the employer in advance of the taking of access and provide a phone number at which it may be contacted pursuant to subsection (3) below.

(3) Once posting has occurred, the employer may find it necessary to change the time or place at which a crew will be working. In that event, the employer shall make reasonable efforts to notify the union of the new time or location.